# IN THE SUPREME COURT OF CALIFORNIA

STANLEY WILSON,
Plaintiff and Appellant,

v.

CABLE NEWS NETWORK, INC., et al.,
Defendants and Respondents.

S239686

Second Appellate District, Division One
B264944

Los Angeles County Superior Court
BC559720

_____

July 22, 2019

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

_____

# WILSON v. CABLE NEWS NETWORK, INC.

## S239686

Opinion of the Court by Kruger, J.

Code of Civil Procedure section 425.16 (section 425.16), commonly known as the anti-SLAPP statute, allows defendants to request early judicial screening of legal claims targeting free speech or petitioning activities. We consider two questions concerning the application of the anti-SLAPP statute to certain claims arising in the employment context.

The primary question before us concerns the statute's application to employment discrimination and retaliation claims. Here, a journalist alleges that his employer denied him promotions, gave him unfavorable assignments, and ultimately fired him for unlawful discriminatory and retaliatory reasons. Some courts of appeal, including the court in this case, have concluded the anti-SLAPP statute cannot be used to screen claims alleging discriminatory or retaliatory employment actions. We hold otherwise. The statute contains no exception for discrimination or retaliation claims, and in some cases the actions a plaintiff alleges in support of his or her claim may qualify as protected speech or petitioning activity under section 425.16. In such cases, the plaintiff's allegations about the defendant's invidious motives will not shield the claim from the same preliminary screening for minimal merit that would apply to any other claim arising from protected activity. The defendant employer in this case has shown plaintiff's claims arise in limited part—though not in whole—from protected activity. The employer is therefore entitled to a determination

of whether those limited portions of plaintiff's claims have sufficient potential merit to proceed.

The second question concerns the application of the anti-SLAPP statute to the journalist's claim that defendant defamed him by privately discussing the alleged reasons for his termination with potential employers and others. We conclude that this claim need not be screened for merit because these privately communicated remarks were not made in connection with any issue of public significance, as the statute requires. (See § 425.16, subds. (a), (b)(1), (e)(4).) We thus affirm in part, reverse in part, and remand for further proceedings.

## I.

Plaintiff Stanley Wilson began working for Cable News Network, Inc., in 1996, and wrote and produced stories for the network for more than 17 years. During his tenure, Wilson covered matters of general public importance, including multiple presidential elections, the Bush v. Gore controversy, the September 11, 2001 attacks, and Hurricane Katrina. For his work, Wilson attained recognition in the field, receiving three Emmy awards and many other journalism honors.

In 2004, Wilson, who is African American and Latino, began raising concerns about the network's treatment of African-American men. He also took a five-week paternity leave after the birth of his twin children in 2013. According to Wilson, the network rewarded him with menial assignments and denied him promotions in favor of younger and less experienced White candidates.

Wilson's tenure came to an end in 2014, after Wilson drafted a story covering the unexpected retirement of Los Angeles County Sheriff Lee Baca. An editor reviewing the draft

flagged several passages that appeared similar to another news organization's published story. Citing concerns about plagiarism, the network placed Wilson on leave of absence and ultimately fired him.

Wilson filed suit against Cable News Network, Inc., various affiliated corporate entities, and his supervisor. (For simplicity's sake, we will refer to defendants collectively as CNN.) Wilson's complaint contains seven causes of action, six of which challenge CNN's alleged discrimination and retaliation. Specifically, Wilson alleges he was denied promotions, given unfavorable assignments, and ultimately fired because of his race and other protected characteristics,[1] as well as in retaliation for exercising his right to make complaints about discrimination and his right to take parental leave. (See Gov. Code, §§ 12940, 12945.2.) He further alleges wrongful termination in violation of the public policy against employment discrimination and retaliation. (See *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1089–1097.) In his seventh and final cause of action, Wilson alleges that CNN defamed him by telling prospective employers and others that Wilson had committed plagiarism in violation of CNN's standards and practices.

CNN filed an anti-SLAPP motion. (§ 425.16.)[2] It argued that the first six causes of action arose, in whole or in part, from

---

[1] Wilson was 51 when he was fired. His wife had a medical condition. On these facts, Wilson alleges CNN discriminated against him because of his age and association with a disabled person. (See Gov. Code, §§ 12926, subd. (m), 12940, subd. (a).)

[2] An anti-SLAPP motion seeks to strike a "[s]trategic lawsuit against public participation," that is, a "SLAPP." (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109 & fn. 1.)

Wilson's termination, and CNN's decision to fire Wilson was in furtherance of its right to determine who should speak on its behalf on matters of public interest. CNN further argued that the defamation cause of action arose from protected speech because its statements as to whether Wilson met CNN's editorial standards in reporting on a matter of public interest furthered CNN's exercise of free speech rights. The trial court agreed with these arguments, concluded that Wilson had not shown any of his claims had minimal merit, and granted the motion.

A divided Court of Appeal reversed. (*Wilson v. Cable News Network, Inc.* (2016) 6 Cal.App.5th 822, review granted Mar. 1, 2017, S239686 (*Wilson*); see *id.* at p. 840 (dis. opn. of Rothschild, P. J.).) The majority held the trial court erred in granting the motion to strike Wilson's employment discrimination and retaliation claims because the claims arose from "defendants' allegedly discriminatory and retaliatory conduct against him, not the particular manifestations of the discrimination and retaliation, such as denying promotions, assigning him menial tasks, and firing him." (*Id.* at p. 836.) Reasoning that discrimination and retaliation do not qualify as protected activity, even when committed by a news organization, the majority concluded the anti-SLAPP statute did not apply. (*Id.* at pp. 834–837.) The dissent disagreed, urging that the claims arose from CNN's decision about who would report the news on its behalf, a decision in furtherance of CNN's exercise of free speech rights. (*Id.* at pp. 840–842 (dis. opn. of Rothschild, P. J.).) The majority and dissent likewise disagreed over the treatment of Wilson's defamation claim: The majority thought the trial court was wrong to strike the claim, while the dissent

took the opposite view.  (See *id.* at pp. 837–840; *id.* at pp. 845–846 (dis. opn. of Rothschild, P. J.).)

The Court of Appeal's decision in this case added to a growing divide over whether, in an employment discrimination or retaliation case, the employer's alleged motive to discriminate or retaliate eliminates any anti-SLAPP protection that might otherwise attach to the employer's employment practices.[3]  We took review to answer that question and to address the application of the anti-SLAPP statute to Wilson's related defamation claim.

---

[3]     Compare *Bonni v. St. Joseph Health System* (2017) 13 Cal.App.5th 851, 861, 863–864 (basis for a retaliation claim is the defendant's unprotected retaliatory motive for an adverse action, not the adverse action itself), review granted November 1, 2017, S244148; *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, 1187–1193 (basis includes the defendant's retaliatory motive) with *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1108 (alleged "discriminatory motive" does not "negate[] protections that otherwise would apply to the defendant's conduct" under the anti-SLAPP statute), review granted April 24, 2019, S254646; *Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 380 (courts should focus on allegations of conduct, not motive, because " ' "[c]auses of action do not arise from motives; they arise from acts" ' "), review granted May 10, 2017, S240704; *Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1520 (same); *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 268–269 (same); see also *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 104 (in a self-dealing case, concluding the underlying conduct, not the alleged motive, is the basis), review granted August 16, 2017, S242529.

## II.

Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. (See § 425.16, subd. (a); *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) To that end, the statute authorizes a special motion to strike claims "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

A court evaluates an anti-SLAPP motion in two steps. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) If the plaintiff fails to meet that burden, the court will strike the claim. Subject to certain exceptions not relevant here, a defendant that prevails on a special motion to strike is entitled to attorney fees and costs. (§ 425.16, subd. (c).)

Because the Court of Appeal determined CNN had failed to carry its initial burden, we are here concerned only with the first step of the analysis. The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A "claim may be struck only if the speech or petitioning

6

activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) To determine whether a claim arises from protected activity, courts must "consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063.) Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of " 'act[s]' " protected by the anti-SLAPP statute. (§ 425.16, subd. (e); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66.)

CNN relies on section 425.16, subdivision (e)(4), which protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[4] Whether Wilson's claims arise from activity protected by this provision is a matter we consider de novo. (*Park*, *supra*, 2 Cal.5th at p. 1067), evaluating the context and content of the asserted activity (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 144–145, 149).

### III.

Wilson's intentional discrimination and retaliation claims are the centerpiece of his complaint. To prove unlawful discrimination, Wilson must show he was a member of a

---

[4] The other parts of subdivision (e) shield statements and writings made in connection with official proceedings or in public on matters of public interest. (See § 425.16, subd. (e)(1)–(3).)

protected class; was performing competently in the position he held, and suffered an adverse employment action such as termination or demotion; and that other circumstances suggest a discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.)[5] To prove unlawful retaliation, Wilson must likewise show CNN subjected him to adverse employment actions for impermissible reasons—namely, because he exercised rights guaranteed him by law. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [retaliation under the Fair Employment and Housing Act]; *Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491 [retaliation for taking family leave].) Finally, Wilson's wrongful termination claim turns on proof that Wilson was terminated and the reason for the firing violates public policy. (*Gantt v. Sentry Insurance*, *supra*, 1 Cal.4th at pp. 1089–1090.)[6] In sum, all of Wilson's

---

[5] These are the elements of a disparate-treatment claim of discrimination—that is, a claim of "*intentional* discrimination against one or more persons on prohibited grounds." (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 354, fn. 20.) A plaintiff may also raise other theories of discrimination or harassment, each of which has different elements. (See *ibid.* [recognizing disparate-impact theory of discrimination, that is, the theory "that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class"]; *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043 [quid pro quo harassment]; *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 [hostile work environment harassment].) Wilson does not rely on any of those theories here.

[6] The same is true of the sixth claim for declaratory relief, which is derivative of the other five. The complaint alleges an actual controversy as to whether CNN's decision to terminate Wilson was motivated by discrimination.

employment-related claims depend on two kinds of allegations: (1) that CNN subjected Wilson to an adverse employment action or actions, and (2) that it took these adverse actions for discriminatory or retaliatory reasons. The critical threshold question before us is whether such claims can ever be said to be based on an "act . . . in furtherance" of speech and petitioning rights under section 425.16, subdivisions (b)(1) and (e)(4). The Court of Appeal answered no. We disagree.

## A.

Whether it is unlawful for a person to perform a particular action or engage in a particular activity often depends on whether the person has a good reason for doing it—or, at least, has no bad reason for doing it. For example, it is ordinarily perfectly lawful for a person to possess a screwdriver, but to possess one for the purpose of burglarizing a house is a criminal offense. (See Pen. Code, § 466.) It is likewise lawful to file a lawsuit—even a meritless one—but to do so for the sake of impoverishing an enemy constitutes the tort of malicious prosecution. (See *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 49–51.) The laws proscribing intentional discrimination and retaliation in employment and other areas belong to this category of prohibitions. It is ordinarily perfectly permissible for an employer to decide not to hire, not to promote, or to fire an employee. The employer may not, however, act based on "the race, religious creed, color, national origin," or other protected characteristic of the employee (Gov. Code, § 12940, subd. (a)), or because the employee has exercised certain rights guaranteed by law, including the right to complain about discrimination (e.g., *id.*, subd. (h)).

This feature of the antidiscrimination and antiretaliation laws has led some appellate courts, including the Court of Appeal in this case, to conclude that discrimination and retaliation claims fall outside the scope of the anti-SLAPP statute. The appellate court here reasoned that because the adverse employment actions Wilson alleged would have been perfectly lawful in the absence of CNN's discriminatory or retaliatory motive, Wilson's claims must be based on CNN's unprotected discrimination or retaliation—and not "the particular manifestations of the discrimination and retaliation, such as denying promotions, assigning him menial tasks, and firing him." (*Wilson, supra*, 6 Cal.App.5th at p. 836, rev. granted.) On this view, it does not matter that one of these "particular manifestations" might otherwise qualify as protected speech or petitioning activity. If the plaintiff alleges the defendant acted for discriminatory or retaliatory reasons, the plaintiff's allegation of illicit motive will defeat any argument for anti-SLAPP protection.

This view cannot be squared with either the statutory text or our precedent interpreting it. It is true that a cause of action for intentional discrimination would be incomplete without allegations of a discriminatory motive. But a cause of action for discrimination would likewise be incomplete without allegations of concrete adverse action. (See *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 355.) For pleading purposes, both are necessary elements; neither is privileged over the other. It follows that even if a plaintiff's discrimination claim can be said to be based in part on the employer's purported wrongful motives, it is necessarily *also* based on the employer's alleged acts—that is, the various outward "manifestations" of the employer's alleged wrongful intent, such as failing to promote,

giving unfavorable assignments, or firing. (*Wilson, supra*, 6 Cal.App.5th at p. 836, rev. granted; see Black's Law Dict. (6th ed. 1990) p. 25, col. 2 [defining "act" as the "external manifestation of [an] actor's will" and, more generally, as "an effect produced in the external world by an exercise of the power of a person objectively, prompted by intention"].) Under the first step of the anti-SLAPP analysis, that is the end of the story, for it is the defendant's acts that matter. (See § 425.16, subd. (b)(1) [protecting "any act of that person" in furtherance of particular rights]; *Park, supra*, 2 Cal.5th at p. 1063 [at the first step of the anti-SLAPP inquiry, courts must "consider the elements of the challenged claim and what *actions* by the defendant supply those elements and consequently form the basis for liability," italics added].) If the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply.

Resisting this conclusion, Wilson contends that "the basis of CNN's alleged liability is not staffing or hiring for a news position, but discriminatory treatment and actions." But the discriminatory treatment and actions Wilson alleges in support of his claims *are* actions related to the staffing of CNN's newsroom. The argument thus boils down to an assertion that, for purposes of the first step of the anti-SLAPP analysis, a court must accept Wilson's allegation that the challenged personnel actions were taken for discriminatory reasons and are therefore unlawful. (See *Wilson, supra*, 6 Cal.App.5th at p. 836, rev. granted.) This is not how the anti-SLAPP statute works. In deciding an anti-SLAPP motion, a court must at the second step " 'accept as true the *evidence* favorable to the plaintiff.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3, italics added.) But we have never insisted that the

complaint's allegations be given similar credence in the face of contrary evidence at the first step. Such conclusive deference would be difficult to reconcile with the statutory admonition that courts must look beyond the pleadings to consider any party evidentiary submissions as well. (§ 425.16, subd. (b)(2).)

Nor does the anti-SLAPP statute require a defendant to disprove allegations of illicit motive. At the first step of the analysis, the defendant must make two related showings. Comparing its statements and conduct against the statute, it must demonstrate activity qualifying for protection. (See § 425.16, subd. (e).) And comparing that protected activity against the complaint, it must also demonstrate that the activity supplies one or more elements of a plaintiff's claims. (*Id.*, subd. (b)(1); see *Rand Resources, LLC v. City of Carson*, *supra*, 6 Cal.5th at p. 620 ["A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]."].) At this stage, the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420; *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21), not whether it has shown its acts are ultimately lawful.

We so held in *Navellier v. Sletten* (2002) 29 Cal.4th 82. There, the plaintiffs urged that the defendant's petitioning activity should receive no protection because it was not a valid exercise of speech and petitioning rights, the defendant having previously waived the right to engage in the activity. We disagreed. We acknowledged that the preamble to the statute

does reflect a purpose to protect the "valid exercise" of speech and petition rights. (§ 425.16, subd. (a).) But the Legislature's expression of "a concern in the statute's preamble with lawsuits that chill the valid exercise of First Amendment rights does not mean that a court may read a separate proof-of-validity requirement into the operative sections of the statute. [Citations.] Rather, any 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' " (*Navellier*, at p. 94; see *City of Montebello v. Vasquez*, *supra*, 1 Cal.5th at pp. 422–425 [lawfulness of activity generally addressed in the second step].) To conclude otherwise would effectively shift to the defendant a burden statutorily assigned to the plaintiff. (See § 425.16, subd. (b)(1) [if acts are protected, it is for the "plaintiff [to] establish[] that there is a probability that the plaintiff will prevail on the claim"].)

Consistent with this understanding, at the first step of the anti-SLAPP analysis, we routinely have examined the conduct of defendants without relying on whatever improper motive the plaintiff alleged. For example, in *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, we considered whether claims for malicious prosecution could be subject to an anti-SLAPP motion. The plaintiff urged that filing an action without probable cause was not activity in furtherance of constitutional speech and petition rights, and so such claims should be exempt. We rejected the argument. That the claim arose from the filing of a lawsuit, protected First Amendment activity, was alone dispositive; allegations that the suit was filed without probable cause—or, for that matter, based on a malicious motive—were irrelevant at the first step, and mattered only at the second step.

(*Id.* at pp. 739–740; see *Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at pp. 291–292.)

The same was true in *Park*. There, when considering "what actions by the defendant supply [the] elements" of a claim (*Park*, *supra*, 2 Cal.5th at p. 1063), we determined a discrimination suit arose from the decision to deny the plaintiff tenure and examined whether that decision was protected, without reference to the alleged discriminatory motive (*id.* at pp. 1071–1072). And in *Rand Resources, LLC v. City of Carson*, *supra*, 6 Cal.5th 610, we considered whether claims for intentional interference with contract and prospective economic advantage arose from protected activity. The claims rested in part on the defendants' lobbying the city council and lobbying on behalf of the city. These acts were lawful, considered on their own, but alleged to be wrongful because taken with the intent to disrupt existing and potential contractual relations. We examined whether the acts themselves were protected, without ever suggesting that the plaintiffs' allegations of wrongful motive were sufficient to remove the lobbying activity from the statute's aegis. (See *id.* at pp. 628–630.)[7]

---

[7] Many courts of appeal, too, have correctly recognized that the text of the anti-SLAPP statute and our precedent require a court at the first step to examine the defendant's actions without regard to the plaintiff's allegations about the defendant's motives. (*Symmonds v. Mahoney*, *supra*, 31 Cal.App.5th at pp. 1106–1108, rev. granted; *San Diegans for Open Government v. San Diego State University Research Foundation*, *supra*, 13 Cal.App.5th at p. 104, rev. granted; *Daniel v. Wayans*, *supra*, 8 Cal.App.5th at p. 380, rev. granted; *Collier v. Harris* (2015) 240 Cal.App.4th 41, 53–54; *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, 22, disapproved on another ground in *Park*, *supra*, 2 Cal.5th at p. 1070; *Hunter v. CBS*

To be clear, we do not hold that a defendant's motives are categorically off-limits in determining whether an act qualifies as protected activity under the anti-SLAPP statute. We hold only that the plaintiff's allegations cannot be dispositive of the question. In some cases (including this one, as we explain below), whether the defendant's act qualifies as one in furtherance of protected speech or petitioning will depend on whether the defendant took the action for speech-related reasons. Nothing in the statutory scheme prevents the defendant from introducing evidence establishing such reasons. But there is an important difference between permitting the defendant to present evidence of its own motives in an effort to make out its prima facie case of protected activity and treating a plaintiff's allegations of illicit motive as a bar to anti-SLAPP protection, as Wilson would have us do here.

To conclude otherwise would effectively immunize claims of discrimination or retaliation from anti-SLAPP scrutiny, even though the statutory text establishes no such immunity. As originally drafted, "[n]othing in the statute itself categorically exclude[d] any particular type of action from its operation." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 92.) And although subsequent amendments to the statutory scheme have added exclusions (see Code Civ. Proc., § 425.17; *Simpson Strong-Tie*

_____

*Broadcasting Inc., supra,* 221 Cal.App.4th at p. 1520; *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823; *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 83, disapproved on another ground in *Park, supra,* 2 Cal.5th at p. 1070; *Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at pp. 268–269; *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1186; *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600, 612–613, fn. 8.)

*Co., Inc. v. Gore, supra,* 49 Cal.4th at pp. 21–22), there are none for discrimination or retaliation actions. Nor can we infer that failure to include such an exception was a legislative oversight. After all, a meritless discrimination claim, like other meritless claims, is capable of "chill[ing] the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a); see *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1064 [upholding strike of caller's age discrimination claim against call-in radio talk show].)

Wilson, echoing the Court of Appeal, expresses concern that if the plaintiff's allegations of discriminatory motives are not considered at the first step of the anti-SLAPP analysis, " 'most, if not all, harassment, discrimination, and retaliation cases [will be subject] to motions to strike.' " (*Wilson, supra,* 6 Cal.App.5th at p. 835, rev. granted, quoting *Nam v. Regents of University of California, supra,* 1 Cal.App.5th at p. 1189.) This result would impose substantial burdens on discrimination and retaliation plaintiffs, who would be compelled to establish the potential merit of their claims at an early stage of the litigation, generally "without the benefit of discovery and with the threat of attorney fees looming." (*Nam,* at p. 1189; accord, *Bonni v. St. Joseph Health System, supra,* 13 Cal.App.5th at p. 864, rev. granted; see *Wilson,* at p. 835.)

The concern is overstated. We see no realistic possibility that anti-SLAPP motions will become a routine feature of the litigation of discrimination or retaliation claims. The anti-SLAPP statute does not apply simply because an employer protests that its personnel decisions followed, or were communicated through, speech or petitioning activity. A claim may be struck under the anti-SLAPP statute "only if the speech

or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) Put differently, to carry its burden at the first step, the defendant in a discrimination suit must show that the complained-of adverse action, in and of itself, is an act in furtherance of its speech or petitioning rights. Cases that fit that description are the exception, not the rule.

A brief survey of the case law illustrates the point. For example, in *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 624–625, the court denied a government agency's motion to strike an employee's discrimination claim because the claim arose from various actions that had culminated in the employee's constructive discharge, even though the complaint also mentioned statements critical of the plaintiff's performance. In *McConnell v. Innovative Artists Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169, 176–177, the plaintiffs sued over the modification of their job duties and subsequent termination in retaliation for their filing lawsuits; that these allegedly retaliatory acts were conveyed in writing did not render them protected. And in *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273, 1284–1285, the plaintiff's disability discrimination claims arose from a landlord's failure to accommodate a disability by giving sufficient time to seek alternative housing, not the unlawful detainer action the landlord filed.

In the relatively unusual case in which the discrimination or retaliation defendant does meet its first-step burden of showing that its challenged actions qualify as protected activity, the burden shifts to the plaintiff. But the plaintiff's second-step

burden is a limited one.  The plaintiff need not prove her case to the court (*Briggs v. Eden Council for Hope & Opportunity*, *supra*, 19 Cal.4th at p. 1123); the bar sits lower, at a demonstration of "minimal merit" (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89).  At this stage, " '[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.' " (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940, quoting *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385; see *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

True, in the absence of discovery, even this reduced barrier could pose particular difficulties for discrimination and retaliation plaintiffs, whose claims depend on assertions of motive that are peculiarly within the defendant's knowledge. But "[c]ourts deciding anti-SLAPP motions . . . are empowered to mitigate their impact by ordering, where appropriate, 'that specified discovery be conducted notwithstanding' the motion's pendency." (*Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 66, quoting § 425.16, subd. (g).)  A court exercising its discretion to grant or deny a motion under section 425.16, subdivision (g) should remain mindful that the anti-SLAPP statute was adopted to end meritless suits targeting protected speech, "*not* to abort potentially meritorious claims due to a lack of discovery." (*Sweetwater Union High School Dist. v. Gilbane Building Co.*, *supra*, 6 Cal.5th at p. 949.)  Where a defendant relies on motive evidence in support of an anti-SLAPP

motion, a plaintiff's request for discovery concerning the asserted motive may often present paradigmatic "good cause." (§ 425.16, subd. (g).)

With careful attention to the limited nature of a plaintiff's second step showing, and to granting discovery in appropriate cases, courts can mitigate the burden of anti-SLAPP enforcement on discrimination and retaliation plaintiffs, even if they cannot eliminate it altogether. If the Legislature believes the residual burden is unnecessary or excessive, it certainly can adjust the statutory scheme, as it has before. We cannot, however, rewrite the statute to create an exception the Legislature has not enacted.

In sum, we conclude that for anti-SLAPP purposes discrimination and retaliation claims arise from the adverse actions allegedly taken, notwithstanding the plaintiff's allegation that the actions were taken for an improper purpose. If conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the anti-SLAPP analysis has been carried, regardless of any alleged motivations that supply other elements of the claim. We disapprove *Bonni v. St. Joseph Health System*, *supra*, 13 Cal.App.5th 851, review granted, and *Nam v. Regents of University of California*, *supra*, 1 Cal.App.5th 1176, to the extent they are inconsistent with this conclusion.

## B.

With these principles in mind, we return to the allegations in Wilson's complaint. Wilson alleges a range of adverse employment actions, but the most prominent is CNN's decision in January 2014 to terminate him. Expressly or implicitly, Wilson's firing supplies an element of the first six claims in the

complaint. These claims thus all arise—at least in part—from this adverse action. (See *Park*, *supra*, 2 Cal.5th 1057.) We therefore begin by considering whether firing Wilson qualifies as an act in furtherance of CNN's right to free speech. (§ 425.16, subd. (b)(1).)

CNN is a cable and Internet news organization. Its publication of news concerning matters of public interest is an exercise of free speech rights secured by the state and federal Constitutions.[8] CNN does not contend the termination of Wilson's employment is itself speech. But to insulate the exercise of free speech rights against chilling litigation, the Legislature has defined protected activity to include not only the act of speaking, but "any other conduct in furtherance of the exercise of" constitutional speech rights on matters of public interest. (§ 425.16, subd. (e)(4).) CNN makes two arguments for application of that provision here. First, it argues that its selection of content producers is conduct in furtherance of its exercise of speech rights. Second, it argues that its decision to

---

[8] See *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 870 (publication of Internet content entitled to 1st Amend. protection); *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 636 ("Cable programmers . . . engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment"); *Leathers v. Medlock* (1991) 499 U.S. 439, 444 ("Cable television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.' "); *Park*, *supra*, 2 Cal.5th at page 1071 ("The reporting of news, whether in print or on air, is constitutionally protected free speech."); California Constitution, article I, section 2, subdivision (a) ("Every person may freely speak, write and publish his or her sentiments on all subjects . . . .").

enforce its journalistic standards by terminating a writer for alleged plagiarism constitutes conduct in furtherance of protected activity.

The anti-SLAPP statute provides no explicit guidance for evaluating these arguments. Section 425.16, subdivision (e)(4), does not define precisely how, or to what extent, conduct must further the exercise of speech or petition rights to merit protection. At a minimum, the subdivision shields expressive conduct—the burning of flags, the wearing of armbands, and the like—that, although not a "written or oral statement or writing" (§ 425.16, subd. (e)(1)–(3)), may similarly communicate views regarding "matters of public significance" (*id.*, subd. (a)). (See, e.g., *Texas v. Johnson* (1989) 491 U.S. 397, 404–406 [flag burning]; *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503, 505–506 [armbands].) Indeed, the legislative history suggests expressive conduct was foremost in the Legislature's thinking when subdivision (e)(4) was added.[9] But the text's reference to

---

[9] The provision was inserted in 1997, five years after original enactment of the anti-SLAPP statute. The committee reports are uniform in describing the motivation for the provision. Proponents asserted "that the constitutional right of free speech and petition also includes constitutionally protected expressive conduct." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, p. 4; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, p. 4.) The Legislature agreed and sought to codify the principle that expressive conduct, like expressive speech, is protected activity. (See, e.g., Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296, *supra*, pp. 3–4; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1296, *supra*, p. 4; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, p. 4.)

acts "in furtherance" of speech or petitioning rights can also reasonably be read to extend to at least certain conduct that, though itself containing no expressive elements, facilitates expression.

A news organization's hiring or firing of employees—like virtually everything a news organization does—facilitates the organization's speech to some degree. But it does not follow that everything the news organization does qualifies as protected activity under the anti-SLAPP statute. The First Amendment does not immunize news organizations from laws of general applicability "simply because their enforcement . . . has incidental effects on [the press's] ability to gather and report the news." (*Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 669.) We likewise do not read the anti-SLAPP statute to call for preliminary screening of every claim that might be brought against a news organization, merely because the claim might have incidental effects on the organization's operation. The question we must consider is whether, and when, a news organization's selection of its employees bears a sufficiently substantial relationship to the organization's ability to speak on matters of public concern to qualify as conduct in furtherance of constitutional speech rights.

**1.**

We begin with the first, and broader, of CNN's two arguments: that its decisions to hire or fire writers and other content producers categorically qualify as conduct in furtherance of its speech rights. The argument rests on two basic propositions. One, the right of a news organization to speak includes the right to exercise editorial control and judgment—that is, the right to choose what news it will report

and how the news will be reported. (*Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 258.) And two, an entity can act and speak only through the individuals that comprise and represent it. The law thus recognizes that, to exercise certain First Amendment freedoms, such as the right of free exercise of religion, an entity "must retain the corollary right to select its voice." (*Petruska v. Gannon University* (3d Cir. 2006) 462 F.3d 294, 306; see *ibid.* [ministerial exception to federal employment discrimination law]; accord, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (2012) 565 U.S. 171, 185 ["it is impermissible for the government to contradict a church's determination of who can act as its ministers"].)

But in the area of press freedoms, it has long been established that the First Amendment does not guarantee a news organization absolute control over who may write, report, or even edit on its behalf. (*Associated Press v. Labor Board* (1937) 301 U.S. 103, 130–133 (*Associated Press*).) In *Associated Press*, the National Labor Relations Board (NLRB) charged the respondent news organization with unlawfully discharging an editorial employee for engaging in union activity and ordered the employee reinstated. Challenging the NLRB's order on First Amendment grounds, the news organization urged that "whatever may be the case with respect to employees in its mechanical departments it must have absolute and unrestricted freedom to employ and to discharge those who . . . edit the news." (*Id.* at p. 131.) The Supreme Court rejected this as an "unsound generalization" (*ibid.*), noting that the constitutional guarantees of free speech and a free press afford "[t]he publisher of a newspaper . . . no special immunity from the application of general laws" (*id.* at p. 132; see *Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376, 382–383; *Shulman v. Group*

*W Productions, Inc.* (1998) 18 Cal.4th 200, 239). Regulation of the press's labor practices was permissible, provided it left untrammeled "the full freedom and liberty of the petitioner to publish the news as it desires it published or to enforce policies of its own choosing with respect to the editing and rewriting of news for publication." (*Associated Press*, at p. 133.)

Courts in various contexts have applied these principles to distinguish between permissible regulation and unconstitutional interference with a newspaper's editorial judgment. In *Passaic Daily News v. N.L.R.B.* (D.C. Cir. 1984) 736 F.2d 1543, 1549, for example, the court held that the NLRB could order the reinstatement of a newspaper columnist unlawfully discharged for engaging in union activity, though it drew the line at compulsory future publication of his weekly column. In *McDermott v. Ampersand Pub., LLC* (9th Cir. 2010) 593 F.3d 950, in contrast, the court invalidated an NLRB order requiring reinstatement of news reporters and editors, but it did so because these individuals had been discharged for "union activity directed at pressuring the newspaper's owner and publisher to refrain from exercising editorial control over news reporting"; the court explained that under the circumstances, relief "in support of union activity aimed at obtaining editorial control poses a threat of violating" the newspaper's First Amendment editorial rights. (*Id.* at p. 953; but see *id.* at pp. 968–971 (dis. opn. of Hawkins, J.) [injunction ordering reinstatement does not risk 1st Amend. infringement].) In *Nelson v. McClatchy Newspapers* (Wn. 1997) 936 P.2d 1123, the Washington Supreme Court held that the First Amendment partially invalidated a statute prohibiting discrimination against employees for political participation because, in its judgment, the nature of the regulation directly interfered with

the plaintiff newspaper's ability to maintain journalistic integrity and credibility by restricting its employees' political activism. (*Id.* at p. 1133; but see *id.* at p. 1133 (dis. opn. of Dolliver, J.) ["The First Amendment does not give a newspaper immunity from general laws absent a showing of interference with the newspaper's right to determine what to print."].)[10]

The considerations raised in these cases differ, but the bottom line is this: Not every staffing decision a news organization makes—even with respect to those who write, edit, or otherwise produce content—enjoys constitutional protection. As a general rule, application of laws prohibiting racial and other forms of discrimination will leave the organization with "the full freedom and liberty" to "publish the news as it desires it published." (*Associated Press*, *supra*, 301 U.S. at p. 133.) It follows that, also as a general rule, a legal challenge to a particular staffing decision will have no substantial effect on the news organization's ability to speak on public issues, which is the anti-SLAPP statute's concern.

Like most general rules, this one does admit of exceptions. Indeed, Wilson himself acknowledges that in some instances a news organization's hiring decisions could qualify as conduct in furtherance of the organization's constitutionally protected speech on matters of public interest. He agrees, for example,

---

[10] As another example, in *Hausch v. Donrey of Nevada, Inc.* (D.Nev. 1993) 833 F.Supp. 822, 832, the federal district court rejected a newspaper's First Amendment defense to the employment discrimination claim of a managing editor based on failure to promote her to the position of editor, reasoning that the application of antidiscrimination laws did not burden the newspaper's "ability to control the content and character of their newspaper's message."

that a television producer's decision about whom to cast in a program can constitute part of the message conveyed, thus meriting anti-SLAPP protection. (Cf. *Hunter v. CBS Broadcasting Inc., supra*, 221 Cal.App.4th at p. 1527 [holding that choice of on-air employee to speak on behalf of news organization furthers organization's exercise of speech rights].) Likewise, the decision to hire or fire an employee who is vested with ultimate authority to determine a news organization's message might well have a substantial effect on the organization's ability to speak as it chooses on matters of public concern. Lawsuits directed at influencing the selection of individuals who wield that type of ultimate authority could chill participation in the discussion of public issues, as surely as suits targeting the act of speaking itself. But not so with other employees in a newsroom who may contribute to, but lack ultimate say over, their employer's speech. (See *Manson v. Little Rock Newspapers, Inc.* (E.D.Ark. 1999) 42 F.Supp.2d 856, 865 ["A reporter has no free-standing First Amendment right to have her articles published by a privately-owned newspaper for which she works."].) Suits over the hiring and firing of such employees—without more—pose no comparable threat to the exercise of editorial discretion.

As the movant, CNN has the burden of showing Wilson's role bore such a relationship to its exercise of editorial control as to warrant protection under the anti-SLAPP statute. CNN has failed to make that showing. CNN does not contend that as a field producer Wilson had authority to decide what CNN would air. Instead, CNN relies solely on Wilson's part-time role as a writer for its website, a comparatively minor part of his duties. But CNN does not demonstrate that Wilson, in his capacity as a writer, had authority to determine what would appear on CNN's

website. Indeed, the facts of this case demonstrate the contrary. Wilson's work was vetted and reviewed by others who did have editorial power, and who decided whether his work should—or in the case of the Baca story, should not—be published by CNN. As far as the record shows, Wilson was one of countless employees whose work contributes to what a large news organization like CNN says about the issues of the day, but was not among those who appear on-air to speak for the organization or exercise authority behind the scenes to determine CNN's message. CNN's decisions concerning which assignments to give Wilson and whether to continue employing him, without more, had no substantial relationship to CNN's ability to speak on matters of public concern. It follows that a claim based on these decisions, without more, falls outside the reach of the anti-SLAPP statute.

## 2.

CNN's second, and narrower, argument focuses on its specific asserted reason for terminating Wilson—his alleged plagiarism—rather than his general role as a content producer. In support of its motion, CNN submitted numerous declarations attesting that it became aware of possible plagiarism by Wilson, investigated the possibility, and elected to terminate Wilson based on its findings. CNN's declarations also detail CNN's prohibition against plagiarism, its policy of sanctioning employees who engage in plagiarism, and the editorial controls CNN has in place to ensure plagiarism will not occur.

Wilson acknowledges his termination followed an investigation into plagiarism, though he disputes CNN's conclusions and claims the plagiarism rationale was pretextual. We need not, however, determine whether Wilson plagiarized,

or whether any plagiarism was a true motive for his termination. The question is only whether CNN has made out a prima facie case that activity underlying Wilson's claims is protected. (*City of Montebello v. Vasquez, supra*, 1 Cal.5th at p. 420; *Simpson Strong-Tie Co., Inc. v. Gore, supra*, 49 Cal.4th at p. 21.)

CNN's plagiarism rationale for terminating Wilson evokes a line of cases concerning the right of news organizations to maintain and enforce standards of journalistic ethics. In *Newspaper Guild, etc. v. N.L.R.B.* (D.C. Cir. 1980) 636 F.2d 550 (*Newspaper Guild*), the D.C. Circuit held that a newspaper's code of ethics—unlike other terms of employment—is not the proper subject of mandatory collective bargaining. It explained: "[P]rotection of the editorial integrity of a newspaper lies at the core of publishing control. In a very real sense, that characteristic is to a newspaper or magazine what machinery is to a manufacturer. At least with respect to most news publications, credibility is central to their ultimate product and to the conduct of the enterprise. . . . [¶] . . . [A] news publication must be free to establish[,] without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity." (*Id.* at pp. 560–561, fns. omitted.) The Washington Supreme Court would later draw on this reasoning to invalidate the state's political participation law as applied to a newspaper that had adopted rules against employees' political activism. (*Nelson v. McClatchy Newspapers, supra*, 936 P.2d at pp. 1131–1132.) "Editorial integrity and credibility," it held, "are core objectives of editorial

control and thus merit protection under the free press clauses." (*Id.* at p. 1131.)

We need not precisely delineate the reach of the relevant constitutional principles here. (*City of Montebello v. Vasquez*, *supra*, 1 Cal.5th at pp. 421–422.) The only question before us is whether, as CNN argues, its decision to terminate Wilson for plagiarism was conduct "in furtherance of" the organization's speech rights within the meaning of section 425.16, subdivisions (b)(1) and (e). We conclude it was.

Online and on air, CNN covers myriad "matters of public significance." (§ 425.16, subd. (a).) Its broadcasts and publications include extensive "speech in connection with a public issue or an issue of public interest." (*Id.*, § sub. (e)(4).) CNN presented evidence tending to show that its ability to participate meaningfully in public discourse on these subjects depends on its integrity and credibility. Plagiarism is universally recognized as a serious breach of journalistic ethics. Disciplining an employee for violating such ethical standards furthers a news organization's exercise of editorial control to ensure the organization's reputation, and the credibility of what it chooses to publish or broadcast, is preserved. These objectives lie "at the core" of the press function. (*Newspaper Guild*, *supra*, 636 F.2d at p. 560; see *id.* at p. 561.) CNN has made out a prima facie case that its staffing decision was based on such considerations, and that such decisions protect the ability of a news organization to contribute credibly to the discussion of public matters. The staffing decision thus qualifies as "conduct in furtherance" of CNN's "speech in connection with" public matter. (§ 425.16, subd. (e)(4).)

But CNN's invocation of journalistic ethics only takes it so far. The lone act CNN justifies as motivated by the need to enforce editorial standards forbidding plagiarism is its termination of Wilson. CNN's own evidence demonstrates that it was unaware of any potential plagiarism until a few weeks before Wilson was let go. CNN has thus carried its first-step burden only insofar as Wilson's employment-related claims arise from his termination. To the extent Wilson's causes of action include claims of illegal discrimination and retaliation based on other acts—passing him over for promotions, menial assignments, and so on—these causes of action will survive, even if the termination-specific claims are stricken. (See *Baral v. Schnitt, supra*, 1 Cal.5th at pp. 393–394 [anti-SLAPP motions target only those claims within a cause of action that rest on protected activity].)

Because the Court of Appeal concluded CNN had wholly failed to meet its first-step burden, it did not address whether Wilson's termination claims must be stricken, or whether they instead have the requisite minimal merit to proceed. We remand on these claims so the Court of Appeal may address that issue in the first instance.

## IV.

We turn next to Wilson's defamation claim. According to the complaint, CNN told third parties, including prospective employers, that Wilson "had plagiarized . . . passages in the Baca story and thereby violated CNN standards and practices."[11] Wilson's declaration also describes a statement by

---

[11] Wilson's complaint alleges the statements to those outside the company on information and belief. No contextual details are provided.

a CNN human resources manager, at a meeting with Wilson and Wilson's supervisor, defendant Peter Janos, that Wilson had plagiarized. Wilson and CNN disagree over whether these statements were "conduct in furtherance of the exercise of [free speech rights] in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) We conclude they were not.

### A.

In contrast to Wilson's employment-related claims, Wilson's defamation claim is based on CNN's speech rather than any tangible action. A casual reader of the anti-SLAPP statute might wonder whether this makes a difference, since unlike the other provisions of subdivision (e) of section 425.16, subdivision (e)(4) refers to "conduct," not "statement[s]." But courts (including this one) have generally assumed that this reference to "conduct" includes oral or written statements,[12] and a closer reading of the statute reveals why the assumption is correct.

The reason is straightforward: Section 425.16, subdivision (e)(1), (2), and (3), each describe circumstances in which a "written or oral statement or writing" is eligible for protection as an "act" in furtherance of speech or petitioning rights—when the statement is made before an official proceeding, made in a public place on a public issue, and so on. Subdivision (e)(4) extends protection to "any other conduct" that

---

[12] See, e.g., *FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at p. 149 (applying § 425.16, subd. (e)(4) to statements); *Rand Resources, LLC v. City of Carson*, *supra*, 6 Cal.5th at pp. 621–628 (same); *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 109–111 (same); *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1015 (same); *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897–898 (same).

meets the requirements specified in that subdivision. Even though the word "conduct" is often used, particularly in the First Amendment context, in contradistinction to "speech," the use of the phrase "*other* conduct" (*ibid.*, italics added) indicates the Legislature regarded the acts of speaking or writing identified in the preceding provisions as "conduct" too. It follows that "conduct" in subdivision (e)(4) is intended to embrace speech, as well as tangible action. To the extent there is any doubt, we construe the statute broadly to achieve its purposes. (§ 425.16, subd. (a).)

The harder question concerns precisely what kinds of speech are covered by subdivision (e)(4). Unlike its neighboring subdivisions—which define protected conduct "not only by its content, but also by its location, its audience, and its timing" (*FilmOn.com Inc. v. DoubleVerify Inc., supra*, 7 Cal.5th at p. 143)—the "catchall" provision of subdivision (e)(4) contains "no similar contextual references to help courts discern the type of conduct and speech to protect" (*id.* at p. 144). But when a general provision follows specific examples, as subdivision (e)(4) follows subdivision (e)(1) through (e)(3), we generally understand that provision as " ' "restricted to those things that are similar to those which are enumerated specifically." ' " (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 743; accord, *FilmOn.com Inc.*, at p. 144.)

The common thread that runs through subdivision (e)(1) through (e)(3) is that each provision protects speech that contributes to the public discussion or resolution of public issues—a thread that also ties these provisions together with the statute's stated purpose of furthering "continued participation in matters of public significance." (§ 425.16, subd. (a).) It follows that a defendant who claims its speech was

protected as "conduct in furtherance of the exercise of [free speech rights] in connection with a public issue or an issue of public interest" (*id.*, subd. (e)(4)) must show not only that its speech referred to an issue of public interest, but also that its speech contributed to public discussion or resolution of the issue (see *FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at pp. 150–152; *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 217–218; *Wilbanks v. Wolk*, *supra*, 121 Cal.App.4th at p. 898).

## B.

CNN argues its statements were in connection with three issues of public significance: Los Angeles County Sheriff Lee Baca's retirement, Wilson's plagiarism, and the general subject of journalistic ethics. Considering each in turn, we conclude Wilson's defamation claim does not arise from speech on "a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)) that contributed to public discussion of that issue.

Sheriff Baca's retirement was indeed a matter of public interest.[13] But Wilson's claim does not rest on statements CNN

---

[13] The sudden, unexpected retirement of a public official (Mather & Sewell, *Sheriff Lee Baca's retirement: 'Very shocking and very surprising,'* L.A. Times (Jan. 7, 2014) <https://www.latimes.com/local/lanow/la-xpm-2014-jan-07-la-me-ln-sheriffs-bacas-retirement-very-shocking-and-very-surprising-20140107-story.html> [as of July 22, 2019]), who later was convicted of obstructing the FBI investigation into inmate abuse in county jails (Stevens, *Ex-Los Angeles Sheriff Lee Baca Is Sentenced to 3 Years in Prison*, N.Y. Times (May 12, 2017) <https://www.nytimes.com/2017/05/12/us/lee-baca-los-angeles-county-sheriff-sentenced-prison.html> [as of July 22, 2019]), was a chapter in an ongoing scandal that implicated public concerns such as government misfeasance and prison

made about that subject; it rests instead on statements about the reason for Wilson's termination. The story Wilson wrote could have been about some other topic entirely—the state of global financial markets, gardening tips, or anything else under the sun—and his defamation claim would be the same. CNN's alleged statements, although they tangentially referenced Sheriff Baca's retirement, did not contribute to any public, or even private, discussion of that subject. It follows that the defamation claim does not arise from statements made "in connection with" any public issue related to Sheriff Baca's retirement. (§ 425.16, subd. (e)(4).)

CNN contends the actual subject of its statement, Wilson's professional competence and the reasons for his termination, is also an issue of public interest. But not every employment dispute—even at a prominent news organization—is a matter of public significance. Certainly some individuals may be so prominent, or in such a prominent position, that any discussion of them concerns a matter of public interest. (See *McGarry v. University of San Diego*, *supra*, 154 Cal.App.4th at p. 110.) But absent unusual circumstances, a garden-variety employment dispute concerning a nonpublic figure will implicate no public issue. (See, e.g., *Baughn v. Department of Forestry & Fire Protection* (2016) 246 Cal.App.4th 328, 337–339; *Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 934–937; *Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 472; *Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, 1510–1511; *Du Charme v. International Brotherhood of Electrical*

reform. All Internet citations in this opinion are archived by year, docket number, and case name at <https://www.courts.ca.gov/38324.htm>.

*Workers* (2003) 110 Cal.App.4th 107, 113–119; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–929.) Workplace misconduct "below some threshold level of significance is not an issue of public interest, even though it implicates a public policy." (*Rivero*, at p. 924.)

Based on the evidence CNN presented in support of its motion, Wilson is not a figure so prominently in the public eye that any remark about him would qualify as speech on a matter of public concern. CNN cites as proof of Wilson's prominence the numerous stories Wilson's lawsuit and the Court of Appeal decision generated. This reliance is unavailing: "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." (*Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135.) Nor does Wilson's own evidence of his awards make him a person of such notoriety that a statement about the reason for his termination would necessarily concern an issue of public interest (cf. *McGarry v. University of San Diego*, *supra*, 154 Cal.App.4th at p. 110 [reasons for dismissing prominent university football coach of public interest]).

CNN argues the Court of Appeal erred by making Wilson's status as a figure in the public eye a *necessary* component of any showing that CNN's statement about him was protected activity. But the Court of Appeal did no such thing. Rather, the court held that if Wilson were a figure in the public eye, that status could be a *sufficient* basis to conclude statements about him would be on a matter of public interest. (*Wilson*, *supra*, 6 Cal.App.5th at pp. 832–833, rev. granted.) Other grounds might also have justified that conclusion even if Wilson were not well-known. (*Ibid.*) We hold likewise: that a statement is about a

person or entity in the public eye may be sufficient, but is not necessary, to establish the statement is "free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see *FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at pp. 145–146; *Rand Resources, LLC v. City of Carson, supra*, 6 Cal.5th at p. 621.)

CNN's final argument is that, even if Wilson is not a figure in the public eye, discussion of his termination implicates a larger issue that indisputably *is* of public interest—journalistic ethics. This argument rests on "what might be called the synecdoche theory of public issue in the anti-SLAPP statute" (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34): that the discussion of a purported lapse on the part of one of its writers is equivalent to a conversation about the ethical lapses of all journalists everywhere. But for anti-SLAPP purposes, as courts have long recognized, "[t]he part is not synonymous with the greater whole." (*Ibid.*) Contrary to arguments that various defendants have pressed over the years, "[s]elling an herbal breast enlargement product is not a disquisition on alternative medicine. Lying about the supervisor of eight union workers is not singing one of those old Pete Seeger union songs (e.g., 'There Once Was a Union Maid'). And . . . hawking an investigatory service is not an economics lecture on the importance of information for efficient markets." (*Ibid.*; accord, *FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at p. 152; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO*, *supra*, 105 Cal.App.4th at pp. 919, 924.)

Similarly, here, CNN's alleged statements about an isolated plagiarism incident did not contribute to public debate about when authors may or may not borrow without attribution. "What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern." (*Rand Resources, LLC v. City of Carson, supra*, 6 Cal.5th at p. 625; see *Consumer Justice Center v. Trimedica International, Inc., supra*, 107 Cal.App.4th at p. 601 ["If we were to accept [defendant's] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute"].) To sweep in a claim about falsehoods made regarding a nonpublic figure, where the falsehoods do not contribute in any meaningful way to discussion or resolution of an ongoing matter of public significance, would do nothing to advance the statute's stated purpose of shielding defendants from meritless lawsuits designed to chill speech and petitioning on matters of public interest or controversy. (See § 425.16, subd. (a).)

Relevant, too, is the private context of the alleged statements. Granted, private communications may qualify as protected activity in some circumstances. (*FilmOn.com Inc. v. DoubleVerify Inc., supra*, 7 Cal.5th at p. 146; *Navellier v. Sletten, supra*, 29 Cal.4th at p. 91.) But the private context eliminates any possibility of protection under section 425.16, subdivision (e)(3), for example, and here makes heavier CNN's burden of showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4). (See *FilmOn.com Inc.*, at pp. 146, 150–151.)

This case does not resemble other cases in which speech concerning the actions of individual nonpublic figures has been held to contribute to ongoing debate on a public controversy. For example, in *Taus v. Loftus* (2007) 40 Cal.4th 683, 712–713, we considered the case of two scholars who had investigated a claimed instance of repressed memory recovery and who had published and lectured on the case study to urge caution in acceptance of such memories. We had no difficulty concluding the scholars' speech concerning the lessons they drew from their case study was entitled to anti-SLAPP protection; the speech contributed to discussion of a matter of ongoing public debate. Similarly, the Court of Appeal in *M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623 held that a magazine article and television program addressing "the general topic of child molestation in youth sports," a significant public issue, were protected, even though the article and program illustrated their discussion with examples of specific instances of misconduct. (*Id.* at p. 629.) No comparable connection between Wilson's alleged misconduct and any public issue is present here.

For these reasons, we conclude CNN's privately communicated statements about Wilson's purported violation of journalistic ethics do not constitute "conduct in furtherance of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

## V.

CNN has failed to carry its first-step burden with respect to many of Wilson's claims, but it has met that burden with respect to those claims based on the termination of his employment. CNN is therefore entitled to preliminary

screening of those claims to determine whether they have minimal merit.  We affirm the Court of Appeal's judgment in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.


**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Wilson v. Cable News Network, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 6 Cal.App.5th 822
**Rehearing Granted**

_____

**Opinion No.** S239686
**Date Filed:** July 22, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Mel Red Recana

_____

**Counsel:**

Law Offices of Lisa L. Maki, Lisa L. Maki, Jennifer Ostertag; Shegerian & Associates, Jill P. McDonnell and Carney R. Shegerian for Plaintiff and Appellant.

FEM Law Group and F. Edie Mermelstein for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for California Taxpayers Action Network as Amicus Curiae on behalf of Plaintiff and Appellant.

Mitchell Silberberg & Knupp, Adam Levin, Aaron M. Wais, Jolene Konnersman and Christopher A. Elliott for Defendants and Respondents.

Davis Wright Tremaine, Kelli L. Sager, Rochelle Wilcox and Dan Laidman for Los Angeles Times Communications LLP, CBS Corporation, NBCUniversal Media, LLC, American Broadcasting Companies, Inc., Fox Networks Group, Inc., California News Publishers Association and First Amendment Coalition as Amici Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, Jeremy B. Rosen, Felix Shafir and Ryan C. Chapman for California Hospital Association as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jill P. McDonnell
Shegerian & Associates
225 Santa Monica Boulevard, Suite 700
Santa Monica, CA  90401
(310) 860-0770

Adam Levin
Mitchell Silberberg & Knupp
2049 Century Park East, 18th Floor
Los Angeles, CA  90067
(310) 312-2000